IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BUFFALO FIELD CAMPAIGN, | CV 19–165–M–DWM |
| Plaintiff, | |
| vs. | OPINION and ORDER |
| UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE, | |
| Defendant. | |

The Buffalo Field Campaign "is a non-profit public interest organization

founded in 1977 to stop the slaughter of Yellowstone's wild bison, protect the

natural habitat of wild free-roaming bison and other native wildlife, and to work

with people of all Nations to honor the sacredness of the wild bison." (Compl.,

Doc. 1 at ¶ 10.)  As part of its mission, the Buffalo Field Campaign "actively seeks

to document and publicize the plight of the bison." (*Id.* at ¶ 11.)  To that end, it

submitted a request under the Freedom of Information Act ("FOIA") to the

National Park Service in June 2018, seeking disclosure of records concerning

Yellowstone National Park's policy "surrounding the size of the bison population

or herds in the Yellowstone ecosystem." (Doc. 17 at ¶ 1); AR_0001–13.[1]  In July,

---

[1] The Administrative Record, cited as "AR_0000," is filed as Doc. 9.

the National Park Service provided both a "notice of delay" and a partial response

(33 pages). (Doc. 17 at ¶¶ 4–5); AR_0014–23. Following further correspondence,

(*see* Doc. 17 at ¶ 6); AR_0024–27, on August 22, 2018, the Park Service provided

its "final response," fully disclosing 20 documents (108 pages) and partially

disclosing 17 documents (149 pages), (Doc. 17 at ¶ 7); AR_0041–45. Those

redacted records are the subject of this lawsuit.

On October 22, 2018, the Buffalo Field Campaign administratively appealed

the Park Service's final determination, specifically challenging the agency's

reliance on FOIA Exemption 5. (Doc. 17 at ¶ 8); AR_0028–40. Though the

Buffalo Field Campaign consistently contacted the agency to check on the status of

its appeal, *see* AR_0062–66, no formal response was ever received, (Doc. 17 at

¶ 9). On October 10, 2019, the Buffalo Field Campaign filed the present action,

alleging the Park Service violated FOIA by failing to make a timely appeal

determination (Count I) and unlawfully withholding non-exempt public records

(Count II). (Doc. 1.) On December 19, the Park Service released 14 additional

pages, previously withheld in full. (Doc. 17 at ¶ 10.)

The parties have filed cross-motions for summary judgment. (Docs. 14, 20.)

Ultimately, the Park Service fails to show that much of the withheld information is

"the product of a distinct decisionmaking process, as opposed to a routine or

ongoing procedure." *Am. Civ. Liberties Union v. Dep't of Def.*, 2019 WL 3945845, at *7 (D. Mont. Aug. 21, 2019).

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is particularly applicable to judicial review of final agency action, where the issue is "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *City & Cty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (internal quotation marks omitted).

## ANALYSIS

FOIA "was enacted to facilitate public access to Government documents." *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). It requires government agencies to make records "promptly available to any person" upon request. 5 U.S.C. § 552(a)(3)(A). An agency may avoid disclosure only if it proves that the requested documents fall within one of nine enumerated exemptions. *See* 5 U.S.C. § 552(b)(1)–(9); *see also Lane v. Dep't of Interior*, 523 F.3d 1128, 1137 (9th Cir. 2008). In order to meet its burden, an agency may prepare a *Vaughn* index. *See Vaughn v. Rosen*, 484 F.2d 820, 826–27 (D.C. Cir. 1973). The *Vaughn* index must provide enough detail to demonstrate the applicability of any cited exemption,

obviating the need for in camera inspection of withheld documents. *Id.* The index

is also generally accompanied by an agency affidavit, which is entitled to a

presumption of good faith. *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 770

(9th Cir. 2015). Here, the Park Service has submitted a *Vaughn* index, (Doc. 16-

1), and a supporting affidavit of its FOIA Officer, Kerrie Evans, (Doc. 19-1).

## I.    Appeal Determination

The Buffalo Field Campaign first alleges that the Park Service failed to

make a final determination on its FOIA Appeal within the statutory timeframe.

(Doc. 1 at ¶¶ 38–43.) In its briefing, however, the Buffalo Field Campaign

clarifies that this allegation is not an independent cause of action but was included

to show it exhausted its administration appeals. Because there is no independent

cause of action or remedy for the allegations contained in Count I, the Park

Service's motion for summary judgment is granted as to this count.

## II.   Exemption 5

The Buffalo Field Campaign's primary argument is that the Park Service

unlawfully withheld non-exempt public records under Exemption 5. In light of

FOIA's policy favoring disclosure, exemptions are construed narrowly. *Dep't of

Air Force v. Rose*, 425 U.S. 352, 361 (1976). Further, agencies bear the burden of

proving an exemption applies. *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 973

(9th Cir. 2009). "To justify withholding, the government must provide tailored

4

reasons in response to a FOIA request.  It may not respond with boilerplate or conclusory statements." *Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012).

Exemption 5 applies to "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency, provided that the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested."  5 U.S.C. § 552(b)(5).  It allows agencies to withhold documents that are "normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).  It encompasses the deliberative process, attorney work product, and attorney-client privileges.  *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997).  The threshold question is whether the records qualify as "inter-agency or intra-agency memorandums or letters." 5 U.S.C. § 552(b)(5); *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 12 (2001).  The inquiry then turns to whether the records are subject to privilege.  *See Klamath*, 532 U.S. at 12.  The parties do not dispute the former, limiting the discussion to whether the Park Service properly invoked the deliberative process privilege.

The deliberative process privilege applies to records that are both predecisional and deliberative.  *Sierra Club v. U.S. Fish & Wildlife Serv.*, 925 F.3d 1000, 1011–12 (9th Cir. 2019), *cert. granted*, 140 S. Ct. 1262 (Mar. 2, 2020).  "A

5

document is pre-decisional if it is prepared in order to assist an agency decision-maker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* at 1012 (internal quotation marks omitted).  As previously discussed, the "case law is imprecise about whether an agency must point to a particular decision to establish a document as 'predecisional.'" *Am. Civ. Liberties Union*, 2019 WL 3945845, at *6.  But ultimately, "a predecisional document must be the product of a distinct decisionmaking process, as opposed to a routine or ongoing procedure, and that process must contemplate a particular decision will be made, though the decision need not come to fruition." *Id.* at *7.

In addition to being predecisional, a document must be deliberative.  *Sierra Club*, 925 F.3d at 1015.  A document is deliberative if it "reveal[s] the mental processes of the decisionmakers," such that disclosure would discourage candid discussion within an agency.  *Id.* (internal quotation marks omitted).  Factors to consider include the roles of the author and recipient in the decisionmaking process, such as whether the document is addressed to a superior from an inferior, and whether the document reflects the "personal opinions of the writer rather than the policy of the agency." *Maricopa*, 108 F.3d at 1094–95 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)).

6

If invoking Exemption 5, an agency's *Vaughn* index must state for each record withheld: "(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process, and (3) the nature of the decisionmaking authority vested in the document's author and recipient." *Pub. Empls. for Envtl. Responsibility v. EPA*, 213 F. Supp. 3d 1, 13 (D.D.C. 2016). The agency must also "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Ctr. for Investigative Reporting v. U.S. Dep't of the Interior*, ___ F. Supp. 3d ___, 2020 WL 1695175, at *3 (D.D.C. 2020) (internal quotation marks omitted); *see* 5 U.S.C. § 552(a)(8)(A)(i). All segregable, non-exempt portions of the otherwise exempt records must be disclosed, because deliberative process "does not protect documents in their entirety" and "if the government can segregate and disclose non-privileged factual information within a document, it must." *Loving v. Dep't of Def.*, 550 F.3d 32, 28 (D.C. Cir. 2008).

The withheld records can be divided into four categories: (1) emails, (2) briefing statements, (3) a draft Environmental Assessment ("EA"); and (4) drafts of an internal scientific article. They are discussed in turn.

### A.     Emails

Although eight emails were either redacted or withheld, the Buffalo Field Campaign challenges the withholding of only one: a May 16, 2018 message Dan

7

Wenk, the Superintendent of Yellowstone National Park, forwarded to the Senior

Advisor to the Secretary of the Interior. *See* AR_0195–96. Directly preceding the

redacted text is the following email authored by Mr. Wenk:

> The information below is from a trusted colleague in the BLM giving
> me some good information on getting this up and running. Just got this
> yesterday so I haven't made any calls following up on the
> recommendations. This is for you and sharpening any talking points
> please do not share directly with the Secretary.

AR_0195. The subject of the email is "Bison habitat." *Id.* The *Vaughn* index

identifies the redacted information as an internal communication from a

subordinate to a superior "containing suggested actions for the recipient . . . to

take" as well as to "help inform [the recipient's] next steps." (Doc. 16-1 at 7

(second alteration in original).)

As argued by the Buffalo Field Campaign, this withholding fails at the

predecisional stage. Neither the email's contents nor the *Vaughn* index identify a

specific decisionmaking process beyond the routine management of bison and their

habitat. But even if the language regarding "getting this up and running" were

sufficient to make it predecisional, it also fails the deliberative requirement. It is

unclear from either the document or the *Vaughn* index who authored the forwarded

message and what his or her capacity is within the Bureau of Land Management.

Is also unclear whether the redacted information proposes formal recommendations

from the sister bureau or the opinions of the individual employee. Nor does

Wenk's implied ratification of the content fill in the necessary gaps. The Park

Service is required to disclose the redacted material on pages AR_0195–96.

## B.    Briefing Statements

The *Vaughn* index identifies four briefing statements, AR_0068–69, 0075,

0101–03, 0199–200, and two draft briefing statements, AR_0206–07, 0208–09,

that have been partially redacted. While more of these records were originally

withheld, the agency subsequently applied "a new foreseeable harm analysis" and

disclosed additional records on December 9, 2019. (*See, e.g.*, Doc. 16-1 at 2.)

The parties first raise a question about whether the briefing statements are

press releases. This matters because "even if [a] document is predecisional at the

time it is prepared, it can lose that status if it is adopted, formally or informally, as

the agency position on an issue or is used by the agency in its dealings with the

public." *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982)

(internal quotation marks omitted). The agency must also "identify the function

and significance in the agency's decision making process" of the redacted or

withheld materials. *Mayer, Brown, Rowe & Maw LLP v. IRS*, 537 F. Supp. 2d 128,

139 (D.D.C. 2008) (internal quotation marks and alterations omitted).

The record is mixed on this issue. In its opening brief, the Park Service

argues that "to the extent the briefing statements and information memoranda

inform officials' public comments and their decisions to provide public comment,

9

they are likewise pre-decisional." (Doc. 15 at 20.)  In response, the Buffalo Field

Campaign cites *Mayer* and argues that the Service must then show how these

talking points related to the formulation of policy.  Changing course in its final

brief, the Park Service ultimately insists that the statements "are *purely internal*

documents" meant to provide background information and recommendations to

higher-level officials.  (Doc. 23 at 13.)  Though the documents generally read like

internal guidance documents, two identify the "State of Montana, Montana

Congressional Delegation" as "Member" in the caption.  *See* AR_0206, 0208.  It

would therefore appear that these two statements were used in interactions with the

public.  *See Mayer*, 537 F. Supp. 2d at 139.  But even if that were not the case, all

the briefing statements individually fail to meet the withholding requirements as

discussed below.

### 1.    AR_0068–69

This document is titled "Briefing Statement FY 2017" and identifies the

relevant issue as "Bison Management: Long-term Strategy."  AR_0068.  Individual

bullet points are redacted under the headings "Key Points," "Background," and

"Long-Term Management Strategy."  AR_0068–69.  The *Vaughn* index states that

it is the expert recommendations of a subordinate, subject-matter expert to Wenk

about actions he "could take regarding the long-term management strategy of

bison, including information about programs and working groups the agency

10

'could establish' and possible solutions for greater 'public participation.'" (Doc. 16-1 at 1.)  It then states that "[t]hese communications were offered to help create a 'new, unified, management approach' for the 'Interagency Bison Management Plan (IBMP)[.]" (*Id.*)  The Ninth Circuit "rejected the application of the privilege to protect from disclosure the routine collection of data and analysis where the agency could point only to speculative or generalized purposes for which the information would be used." *Lahr*, 569 F.3d at 981.  The continued implementation of the Bison Management Long-term Strategy falls into this category. *See Ecological Rights Found'n v. Fed. Emergency Mgmt. Agency*, 2017 WL 5972702, at *5 (N.D. Cal. Nov. 30, 2017) (rejecting application of "the deliberative process privilege to documents concerning ongoing considerations about what agencies should do with broad regulatory authority").  This information is not predecisional and must be disclosed.

### 2.    AR_0075

The bullet point redacted at AR_0075 is under the heading "Development of a New Interagency Bison Management Plan" in a draft March 2017 Briefing Statement.  According to the *Vaughn* index, the document contains the opinions of a subordinate, subject matter expert "regarding suggested actions for the supervisor to take on a 'NPS . . . proposal and current management.'" (Doc. 16-1 at 2.)  As mentioned above, information regarding "current management" is not generally

11

predecisional.  *See Ecological Rights Found'n*, 2017 WL 5972702, at *5

("Exemption 5 does not protect communications that promulgate or implement an

established policy of an agency.") (internal quotation marks and alteration

omitted).  The *Vaughn* index's reference to a generic "NPS . . . proposal" is not

sufficiently specific to overcome that deficiency.  Disclosure is required.

### 3.    AR_0101–03

The first page of this document is titled "Briefing Statement FY 2018" and

identifies the relevant "issue" as "Long-Term Bison Management Strategy,

including Quarantine."  AR_0101.  Bullet points are redacted under headings for

"Population size," "Culling," "Hunting," "Quarantine," "Tolerance and

relocation," and "Organization and Involvement."  AR_0101.  The second and

third pages are titled "Scope of Work, Bison Quarantine, 2018-2019" and list

actions related to three specific areas: Stephens Creek, Fork Peck Reservation, and

Corwin Springs.  AR_0102–03.  Individual bullet points are redacted under each

area heading.  The *Vaughn* index describes the record as an internal

communication from a subordinate expert to the Bison Program Coordinator,

containing "suggested actions" the latter could take "regarding possible

establishment of 'panels' and new 'testing procedures,' in addition to

approximations of time and bison population sizes."  (Doc. 16-1 at 3–4.)  As with

the records above, the *Vaughn* index identifies actions related to the general,

current management of the bison.  *See Eco. Rights Found'n*, 2017 WL 5972702, at

*5.  This withholding also fails at the predecisional step and must be disclosed.

### 4.    AR_0199–200

The title for this briefing statement is redacted, AR_0199, as well as two

bullet points under the section title "Current Status," AR_0200.  It is difficult to

tell the document's purpose without the title, but the *Vaughn* index indicates an

internal communication wherein an expert, subordinate provided recommendations

for his superior to take, "including what 'would be necessary to define'—including

the carrying capacity for wild bison in certain habitats—before a decision to

undergo a particular evaluation affecting bison populations is made." (Doc. 16-1

at 7.)  This description, unlike those discussed above, sufficiently identifies a

particular decisionmaking process to be predecisional.  It also appears to be

deliberative as it contains recommendations from a subordinate to a superior.  But

the *Vaughn* index only includes boilerplate language about how the release of the

redacted information would deter agency personnel "from sharing opinions, advice

and recommendations in the course of agency decisionmaking." (Doc. 16-1 at 8.)

The Park Service has therefore failed to articulate how the release of this

"particular record—or some category of substantively related records—would

harm the agency's deliberative process." *Ctr. for Investigative Reporting*, 2020

WL 1695175, at *4 (internal quotation marks and emphasis omitted).  This record must be disclosed in full.

### 5.     AR_0206–07

This record is titled "Briefing Statement FY 2018" and regards "Bison Abundance under the Interagency Bison Management Plan."  All the bullet points under the "Key Points" heading are redacted, as well as the final bullet point under "Current Status."  The final version of this document was provided with no redactions at AR_0204–05.  According to the *Vaughn* index, the draft "shows red-lining, including several portions of text not ultimately included in the final draft." (Doc. 16-1 at 8.)  However, the information ultimately disclosed in the "Key Points" section of AR_0204 indicates the redacted material is factual background information unrelated to any decisionmaking process.  As argued by the Buffalo Field Campaign, the presence of redlines or fact that document itself is not final does not necessarily make it either predecisional or deliberative.  *See Heartland Alliance for Human Needs & Human Rights v. U.S. Dep't of Homeland Security*, 291 F. Supp. 3d 69, 79 (D.D.C. 2018).  The Park Service is therefore required to disclose this draft document in its entirety.

### 6.     AR_0208–09

This record is titled "Briefing Statement FY 2018" but the issue area has been redacted, as well as individual bullet points under the sections "Key Points"

14

and "Current Status." The *Vaughn* index describes the document as "providing guidance on the management of bison, including the scientific opinions of ecologists and rangeland managers." (Doc. 16-1 at 8.) That description, however, like those above, describes continued management activity and scientific data with no connection to a particular decision. There is also no identification of who received the document as to identify its role in the decisionmaking process, if any. This record must be disclosed in its entirety.

### C.   Draft EA (AR_0129–86)

This record is an April 20, 2018 Draft Conservation and Management of Yellowstone Bison EA. The Buffalo Field Campaign explicitly concedes that the draft EA is predecisional and appears to implicitly concede that it is deliberative. (*See* Doc. 21 at 33–34; Doc. 23 at 31.) But it argues that the Park Service failed to show disclosure would cause foreseeable harm or release all reasonably segregable, non-exempt portions of the record. The latter argument has merit.

#### 1.   Foreseeable Harm

FOIA prohibits an agency from withholding information unless "the agency reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption." 5 U.S.C. § 552(a)(8)(A). "In other words, even if an exemption applies, an agency must release the document unless doing so would reasonably harm an exemption-protected interest." *Jud. Watch, Inc. v. U.S. Dep't of*

*Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019).  An agency is therefore required to "articulate both the nature of the harm and the link between the specified harm and specific information contained in the material withheld." *Id.* (citing H.R. Rep. No. 114-391, at 9 (2016)).  Though the detail necessary is "context-specific," general references to a chilling effect or other boilerplate language regarding the effect on internal deliberation is insufficient.  *Rosenberg v. U.S. Dep't of Def.*, 2020 WL 1065552, at *10 (D.D.C. Mar. 5, 2020). That said, the government may identify the harm resulting from the disclosure of categories of withheld information as opposed to discussing each record individually. *Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 79 (D.D.C. 2018).

The Park Service argues that because the draft EA is both predecisional and deliberative and the topic of bison management is "so obviously sensitive," the agency's "burden for articulating foreseeable harm is minimal." (Doc. 23 at 17–18, 32–33.)  In doing so, the agency ignores the independent analysis required under § 552(a)(8)(A) and overstates the sensitive nature of the records.  In *Rosenberg*, the court explained that "[i]n some instances, the withheld information may be so obviously sensitive—such as the disclosure of internal deliberations between a high-ranking military commander and senior government officials about a new detention operation in the United States—that a simple statement illustrating why the privilege applies and identifying the harm likely to result from release

16

'may be enough.'" 2020 WL 1065552, at *10. "In other instances—such as where the withheld deliberations involve more mundane, quotidian matters or the decision has already been made—more explanation may be necessary." *Id.*

Though contentious, bison management cannot be so easily equated with the "obviously sensitive" nature of high-level military operations. Context therefore mandates a heartier foreseeable harm analysis. That said, the Park Service's foreseeable harm analysis meets that standard. The *Vaughn* index states:

> The forced production of draft NEPA compliance documents through FOIA will confuse the issues, mislead the public, and chill open communication and discussion among peers, subordinates, and supervisors. Further, this Environmental Assessment is directly related to the Interagency Bison Management Plan (IBMP) and possible "management approach[s]." Here, as set forth above, the draft EA relates to formulation of policy for the IBMP. If such preliminary versions of documents were to be released and subject to public scrutiny, employees would be reluctant to provide preliminary information, or to commit such information into writing, thereby denying decision-makers access to important information.

(Doc. 16-1 at 6 (alteration in original).) The agency has therefore articulated specific harm to its policy- and decision-making process should early NEPA documents be disclosed under FOIA. *See Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1118–19 (9th Cir. 1988).

## 2.      Segregable Content

"FOIA provides that any 'reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which

are exempt under this subsection.'" *Hamdan*, 797 F.3d at 778–79 (quoting 5

U.S.C. § 552(b)).  "[I]t is reversible error for the district court to simply approve

the withholding of an entire document without entering a finding on segregability,

or the lack thereof, with respect to that document." *Id.* at 779 (internal quotation

marks and alteration omitted).  "The burden is on the agency to establish that all

reasonably segregable portions of a document have been segregated and

disclosed." *Id.* (internal quotation marks omitted).  "The agency can meet this

burden by providing the district court with a reasonably detailed description of the

withheld material and alleging facts sufficient to establish an exemption." *Id.*

(internal quotation marks omitted).  And, "[t]he district court may rely on an

agency's declaration in making its segregability determination." *Id.*

The Park Service argues that the nature of the draft EA made segregation

impossible because disclosing the factual information would also reveal the

agency's decision-making process.  "Thus, despite reviewing the draft EA 'page by

page,' [the Park Service] could not reasonably segregate any portions of the

document without compromising the interests protected by Exemption (b)(5)."

(Doc. 23 at 34.)  The agency's position is unpersuasive.

First, while many of the *Vaughn* index entries state that "factual information

was segregated to the greatest degree possible," (*see, e.g.*, Doc. 16-1 at 6

(referencing AR_00126–27)), the entry related to the draft EA merely states that

pages AR_0130–86 were withheld "in their entirety," (*see id.*).  The agency

declaration provides no further clarification as it does not reference this particular

record but generally states that efforts were taken "to segregate factual information

to the greatest degree possible."  (Doc. 19-1 at ¶ 16.)  Thus, while nuanced

segregation efforts are apparent in other records at issue, they are not in the case of

the draft EA.  Second, it defies common sense that not a single sentence in the

fifty-five pages withheld could be disclosed.  In assessing segregability in

*Hamdan*, the court specifically lauded the State Department's good faith review

based on the fact that single sentences were disclosed throughout pages and pages

of fully redacted information.  *See* 797 F.3d at 780.  Here, the Park Service fails to

provide any evidence of its good faith effort to segregate the information as it has

completely withheld every page of the draft EA (excepting the cover page).  In

doing so, the agency has denied this Court "the opportunity to observe [the

agency's] approach to redaction."  *Id.* at 781.  This matter is therefore remanded to

the agency to determine whether any content can be segregated and disclosed.

### D.    Draft Article (AR_0078–94, 0104–17)

The Park Service withheld two draft scientific articles prepared by agency

scientists.  *See* AR_0078–94, 0105–17.  It also redacted an email reference to a

working title of the article.  *See* AR_0104.  In withholding these records, the Park

Service defines the operative decision as the decision whether to publish the article

and argues that it is deliberative because "there is ongoing, collaborative revision of the article reflecting the agency's ruminations." (Doc. 15 at 32.)  The Buffalo Field Campaign challenges this interpretation and argues that the Park Service failed to show foreseeable harm or attempt to segregate the nonexempt content.

The first question is whether the "decision" at issue can be defined as the decision of whether to publish the article itself.  Though persuasive, the authority relied on by the Park service is distinguishable.  "The D.C. Circuit has found that where a plaintiff requests records of correspondence surrounding or leading up to an agency publication, the relevant agency decision for purposes of applying the deliberative process privilege is the decision to publish." *Hooker v. U.S. Dep't of Health & Human Servs.*, 887 F. Supp. 2d 40, 57 (D.D.C. 2012).  However, in those cases, the FOIA request itself was specifically directed at the information surrounding the publication. *See id.* (collecting cases).  Here, the Buffalo Field Campaign's FOIA request is broader.  Additionally, the Park Service implies that the agency may never have intended to publish the article. (*See* Doc. 23 at 6 n.1; *but see id.* at 8 (stating that "NPS scientists drafted the article with the initial intent of publishing it" but statement not supported by citation).)  The *Vaughn* index, for example, states that the document is "an early draft of an internal [Park Service] scholarly article" and that it was "never submitted to any publication, or any peer review process." (Doc. 16-1 at 2–3, 4–5.)  If publication was never intended, the

20

agency cannot now argue that it was engaged in a decision-making process culminating in a publication decision. *See Am. Civ. Liberties Union*, 2019 WL 3945845, at *7 (requiring the identification of a particular process even if it never comes to fruition). Finally, the *Vaughn* index indicates the decisionmaking process at issue was "the formulation of policy related to the [Interagency Bison Management] Plan," not publication. (Doc. 16-1 at 3, 4.) But such a broad reference to current bison management is not itself predecisional. To the contrary, the index states that the article "interprets technical data." (*See id.* at 2.) The Park Service fails to show the draft article is predecisional and it must be disclosed.[2]

## CONCLUSION

Accordingly, IT IS ORDERED that the parties' cross-motions (Docs. 14, 20) are GRANTED in PART and DENIED in PART as follows:

(1)     The Park Service's motion is GRANTED as to Count I and as to the full disclosure of the draft EA under Count II. It is DENIED in all other respects.

(2)     The Buffalo Field Campaign's motion is DENIED as to Count I and GRANTED as to Count II as follows:

---

[2] Even if the requirements of Exemption 5 were met, the Park Service fails to show any attempt to segregate non-exempt information. *See Hamdan*, 797 F.3d at 779. Like the draft EA, the agency cannot simply point to line-by-line redactions in other documents to show it met its burden as to this specific record.

(a)     The Park Service is required to disclose AR_0068–69, 0075, 0078–94, 0101–03, 0104–17, 0195–96, 0199–200, 0206–07, 0208–09 in their entirety;

(b)     The draft EA is REMANDED to the Park Service to perform a segregability analysis.  An updated disclosure related to the draft EA shall be provided to the Buffalo Field Campaign within thirty (30) days of the date of this Order.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment consistent with this Order and close the case file.

DATED this _7t_ day of July, 2020.

*15:21 P.M.*

Donald W. Molloy, District Judge
United States District Court